United States District Court
Southern District of Texas
**ENTERED**
September 23, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT　　　SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| United States of America, § § Plaintiff, § § versus § § Morris Alexander Wise, § § Defendant. § | Criminal Action H-12-194-9 |

## Opinion on Suppression

1. *Introduction.*

This case illustrates the dilemma of detention and the fiction of freedom. The police in Conroe routinely board intercity buses to survey for law violations. They stop ordinary buses full of ordinary people – just in case. Although passengers and bus drivers may supposedly decline searches, most people would not feel that they were free to go. The government offers no facts to legitimate Conroe's subjecting people who choose to ride the bus – for economic, environmental, or efficiency reasons – to wide-sweeping and non-individualized searches that their fellow citizens who travel by cars avoid. This tactic is one of many used by the government to fight its "war on drugs." During its forty-five years, the principal casualty of this war has been the Constitution. This stop offends the Constitution.

2. *Background.*

In September of 2011, Morris Alexander Wise boarded Greyhound Bus 6408 in Houston to travel to Chicago. The driver stopped the bus in Conroe, Texas, at a gas station used by Greyhound as a waypoint – where passengers may buy snacks, use the restroom, board, or disembark.

Five officers of the Conroe Police Department laid in wait at the station to search buses. Four of the officers wore casual clothes – jeans, t-shirts, and sneakers – with their badges and guns hidden. A uniformed officer with a drug dog stood near the south margin of the parking lot. A marked car was 50 yards away, beyond the store.

Two of the officers – Randy Sanders and Juan Sauceda – approached the driver as he stepped off the bus. They asked to search the passenger cabin and the luggage hold for drugs. The driver agreed. Sanders and Sauceda boarded the bus. Sauceda walked to

the back while Sanders stayed in front to watch the passengers. Neither identified himself.

### A. Wise

Sanders noticed Wise, his eyes closed, sitting on the left near the middle of the bus. Sanders thought he looked "uncomfortable," a sign, apparently, that Wise was feigning sleep.

Sauceda spoke with two men sitting together towards the back. Because two men sitting together is "suspicious," Sanders walked past Wise to join Sauceda. As he passed, Sanders saw Wise turn his head to watch. Sanders paused and watched him for a few seconds; noticing his eyes flutter and squint. This too was suspicious.

Sanders asked Wise for his bus ticket. The name on the ticket was James Smith. Sanders asked if that was his real name; he said yes. The officer returned the ticket and asked if he had luggage. Wise pointed to the luggage rack above where a duffle bag and a backpack laid next to each other.

### B. Backpack.

When Sanders asked if he could search the bag, Wise handed him the duffle bag; he opened it and found nothing of interest. He then asked if Wise owned the black backpack; Wise said no. After the two officers asked those still on the bus three times if anyone owned the bag, it was still unclaimed.

The officers said the bag was abandoned. They did not ask whether it belonged to anyone who had disembarked or investigate whether it had been left behind from a previous trip. It may have been lost or merely not supervised at the moment. The officers asked the driver if he knew who owned the bag. He said he did not. Taking it off the bus, they noticed it had a small padlock on it.

They placed the backpack on the ground with other luggage and had the dog smell it. Saying that the dog alerted to drugs, the officers used bolt-cutters to cut the lock's shackle. Inside were seven packages wrapped in white cellophane. Cutting into the smallest bundle, the officers saw what they thought was cocaine. Now, apparently divining that it was Wise's, Sanders stepped in the bus, gestured, and asked Wise to come with him. Wise got off the bus.

### C. Wise Arrested.

Once Wise was off the bus, Sanders told him that the backpack had cocaine in it and asked if he had any weapons. When he said no, the officer asked him to empty his pockets. While Wise was taking items out, Sanders noticed a drivers license and asked

to see it; the name was Morris Wise.

Another officer saw a lanyard with keys that Wise put back in his pocket. He asked to see the lanyard. Sauceda took the keys; one fit the lock. They arrested Wise for possession of cocaine.

3. *Buses.*

Suspicionless searches of commercial buses making scheduled stops – or "working the buses" – has become a ubiquitous tactic in the war on drugs.[1] Officers board buses at stops, observe the passengers' reactions, and ask to search whomever they deem suspicious. By policy, Greyhound drivers consent to searches.[2] Supposedly, the passengers are free to decline to talk with the officers or permit searches of their carry-on bags. Reasonable people would not conclude that they were actually free to do so.

Other courts have evaluated whether bus searches were constitutional.[3] In one case, the Supreme Court found that a reasonable bus passenger would feel free to ignore or decline a uniformed officer's request to search him, meaning his consent to the suspicionless search was voluntary. Later, the Court held that the same conduct by plain-clothed officers with concealed weapons and visible badges was also constitutional.

Both decisions skipped the constitutional issues raised by the officers' asking the driver to search the bus. Here, the officers neither wore uniforms nor displayed badges; they did not identify themselves. They were not engaged in an undercover operation. They were searching a commercial bus and asking questions – ordinary police patrol work. Except in light of the Supreme Court's rule that checkpoint searches to find drugs violate the Fourth Amendment,[4] the officers' entrance onto the bus and request to search it was unconstitutional.

4. *Seizures.*

   A. *Checkpoint.*

On that day in September, the police were at the gas station to stop buses and search them; they created a checkpoint for buses.

---

[1] *Florida v. Bostick*, 501 U.S. 429 (1991).

[2] *U.S. v. Wilmington*, 240 F.Supp.2d 311, 315 (M.D. Penn. 2002).

[3] *See, e.g., U.S. v. Drayton*, 536 U.S. 194 (2002); *Bostick*, 501 U.S. 429.

[4] *City of Indianapolis v. Edmond*, 531 U.S. 32, 35 (2000).

A checkpoint search is a police program in which officers gather at a specific place and, following a department-issued script, briefly speak to drivers without having any reason to suspect wrongdoing.[5] Checkpoints range from emergency roadblocks for finding fugitives to guardhouses for controlling entrance to military bases. The most famous one, Checkpoint Charlie, permitted Allied forces to cross between East and West Berlin.

Regardless of its location or function, the essence of a checkpoint remains constant: it is a forced interaction with officers for the discovery of people or things that are not permitted.

(1)   *Forced Interaction.*

A checkpoint is created by placing an officer at a location through which traffic must travel – a choke point. While most checkpoints legally compel cars to stop, the defining characteristic of a checkpoint is the forced interaction with the police, not the stop.

A stop is neither necessary nor sufficient to a checkpoint. A checkpoint at a military base may allow marked cars to pass without stopping; it is still a checkpoint. A stop sign legally compels cars to stop; it is not a checkpoint.

The Greyhound bus's publicly available schedule mandated that it stop at specific gas stations to load and unload passengers. Conroe knew about this mandatory stop and sent its police to apply its drug interdiction program.[6] When the bus driver saw the police waiting, he could not avoid them by, for example, going to another gas station; he was obliged to talk to them. The officers created a checkpoint by forcing the bus driver to interact with them.

(2)   *Illegal Request to Search.*

Checkpoints are a permissible law enforcement tactic but only to investigate specific crimes; by waiting at mandatory stops, the police dishonorably evade those restrictions.

If the police wanted to monitor a road that stretched for three hundred miles without any stops except a gas station at the half way point, they could: (a) gather on the road, stopping every car that travels it, or (b) wait for nearly every car to make the

---

[5] *See, e.g., Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 447 (1990); *Edmond*, 531 U.S. at 35.

[6] Tr. Suppression Hr'g., at 4, 7, ECF No. 204.

natural stop at the gas station and ask the drivers for permission to search their vehicle. Both are checkpoints.

Greyhound buses must stop at specific gas stations, restaurants, and terminals. By waiting at the gas station, the police achieve a checkpoint – asking permission to search every bus – while avoiding the constitutional requirements. The Constitution cannot be so loose a straight-jacket that officers can evade it by merely waiting at normal, necessary stops.

Without any suspicion of crime, the officers forced the bus driver to speak to them; they created a checkpoint that trespassed on the Constitution. They failed.

### B. No Particular, Permissible Purpose.

The Constitution requires searches and seizures to be reasonable. Brief stops at checkpoints are reasonable if they are for a narrow particular law enforcement purpose directly connected to the use of the roads. Police can use a checkpoint to remove drunk drivers, verify licenses and registrations, and run immigration checkpoints near the border.

A checkpoint that seeks merely to uncover evidence of ordinary crimes, like possession of narcotics, violates the Fourth Amendment.[7] The buses were seized without particularized suspicion to search for drugs and, as Conroe's officers testified, anything else. It was an illegal seizure.

When the government gets evidence from an illegal seizure, it must be suppressed unless the government can show that because of a break in the chain of events, the evidence was not a product of the illegal seizure.[8] The government says (a) the bus driver consented to the search of the bus and (b) Wise consented to the search of his bag.

Assuming that the consents were voluntary, they be must be independent acts of free will to break the causal chain between them and the seizure. To ascertain whether the passengers and the driver consented by independent acts of free will, the law considers intervening circumstances, time between the seizure and the consent, and purpose and flagrancy of the officer's illegal seizure.[9]

These consents were not independent acts of free will. Neither grant of permission could have been given without the illegal seizure. Further, the police asked

---

[7] *City of Indianapolis*, 531 U.S. at 41-42.

[8] *U.S. v. Portillo-Aguirre*, 311 F.3d 647, 659 (5th Cir. 2002).

[9] *See id.*

the bus driver for permission to search immediately after the illegal seizure and Wise within five minutes of it. Another court held that voluntary consent after an illegal seizure is not voluntary.[10] Most important, the purpose of the suspicionless seizure was to detect ordinary crimes. Thus, only suppression will deter future, systemic, obfuscation of the Fourth Amendment.

The government strains to justify its agents becoming highwaymen, saying that it stopped the bus because of "security precautions or immigration." One of the officers explained the Conroe program. He testified that they held the bus – with Wise on it – to search for drugs, money, guns, aliens, or anything else they could find – presumably over-due library books included.[11] The government was not ensuring that the driver was sober or verifying the bus's registration. It was not searching for aliens close to a border. The closest international land border – with Mexico – is 350 miles away, and the one with Canada is 1,470 miles away.

Conroe set up a checkpoint at the gas station and seized every bus that stopped there. It impeded the flow of traffic without a shadow of an articuable hunch. The government says that it "knows" people carry drugs on buses. If the police search 1,000 bus passengers, someone will likely have drugs. If they search 1,000 homes in Conroe, they will likely find drugs in at least one of them. That the police are likely to find something when they search enough people in some ordinary place is exactly why the Constitution prohibits their intrusion into the lives of 999 others. The probability that enough searches will discover contraband is a definition of a suspicionless search. This is being arbitrary with a statistical gloss. This was a gratuitous stop at a checkpoint.

The cocaine in Wise's backpack, found as a result of the illegal seizure, must be suppressed.

C.   *Driver's Consent.*

Even if Conroe's checkpoint were a legal seizure, the officers were still required to obtain the permission of the bus driver to search the bus. The officers asked if they could search the bus and under Greyhound policy the driver said yes, but the driver's consent – and the company policy – were not voluntary; they were coerced.

The government has the burden to show by a preponderance of the evidence that

---

[10] *See id.*

[11] U.S. Dep't of Justice, Guide to Equitable Sharing for State and Local Law Enforcement Agencies 3 (2009), available at http://www.justice.gov/sites/default/files/criminal-afmls/legacy/2014/07/31/04-2009guide-equit.pdf.

the driver's consent was truly voluntary. The opportunity for police questioning to enforce criminal laws is weighed against the *possibility* of abusive tactics that coerce consent.[12]

Greyhound transports eighteen million passengers over five billion miles every year, all with the goal of getting its passengers to their destinations on time. Over every one of those miles, Greyhound drivers are open to the threat of police interference – by retaliatory malicious ticketing, holding buses, and arresting drivers – that would destroy schedules and careers.

The dangers to Greyhound and its workers compel it to accede to Conroe's – or other towns' – demands. If officers are able freely to board Greyhound buses and request to search the bus, Greyhound cannot have a policy other than compliance without risking the ire of every excessively zealous or corrupt police force in the places through which its buses travel. Their ire, even at its best, is likely to lead to simple delays and missed connections – real impositions to a bus company's operation and its passengers. Greyhound could not survive if it were to refuse to consent.

Greyhound cannot promise its drivers or passengers that it will refuse an officer's request to search. "Passengers traveling on a commercial bus receive the same degree of constitutional protection and are subject to the same legitimate intrusions on their Fourth Amendment interests as those in private vehicles."[13] But a Greyhound policy that ensures that bus riders may travel the nation's highways protected by the same laws as car riders would destroy the company's ability to compete in reliability and cost. Greyhound is economically coerced to adopt policies of compliance.

The search of the bus was suspicionless, and the arrest based only the coerced policy; it must be suppressed.

5. *Conclusion.*

The Constitution limits the power of government. The national government has ratified the illegal acts of local police. The justifications by the cranky officers at the hearing were a string of phrases – purloined out of context from court decisions – to cover a raid on an unoffending bus and its passengers.

The government's agents need more than it has offered here to impede buses and search travelers. The officers' detention of the bus was unjustified and thus unconstitutional. The officers did not have a reasonable belief of specific criminal

---

[12] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (emphasis added).

[13] *Portillo-Aguirre*, 311 F.3d at 652.

activity, rather they had a juvenile ruse and hoped that it relieved them of their constitutional oath.[14]

The officers' abuse of their authority is bad; however, the federal government's bad judgment in bringing this case is worse. Because it did not tell Conroe that it needs to change its policies or decline to prosecute Conroe's cases for its tactics, it has reinforced the officers' illegal evasions. It may need statistics to justify its funding to Congress, but this is a weak and mean way to cater to its bureaucratic imperative.

Signed on September 23, 2016, at Houston, Texas.

Lynn N. Hughes
United States District Judge

---

[14] U.S. Const. art. VI.